UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Michael R., | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 18 CV 50217 |
| | ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**[1]

Plaintiff is seeking disability benefits based his impairment of silicosis, a non-curable and progressive lung disease caused by inhaling tiny bits of silica. Starting in 1989, plaintiff worked as a concrete laborer, and it is assumed he got silicosis from this work. Plaintiff was first diagnosed in 2003 at which time he stopped working and filed a worker's compensation claim, eventually receiving a lump sum settlement of $320,000. R. 849. He did not return to work until the 2008-09 timeframe (the exact date is unclear) when he worked for five or six months before stopping because, he claims, his silicosis made him unable to keep up with the job demands. For a brief period in 2011, he tried working as a handyman, but stopped again because of his health.

In December 2011, he filed a Title II disability application. Since he only filed a Title II application, he had to prove that he was disabled in the period between his alleged onset date of May 20, 2009 and his date last insured ("DLI") of September 30, 2010. The Court will refer to this 16-month period as the "DLI period." The key issue in this case is whether plaintiff can

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

show that he was disabled during the DLI period rather than at some later point when his silicosis indisputably worsened.

In 2013, an administrative law judge ("ALJ"), after holding a hearing, issued a four-and-half page decision finding that plaintiff was not disabled. No expert was called at this hearing. Plaintiff appealed that ruling to this Court and the parties voluntarily agreed to a remand. The same ALJ held a second hearing. Dr. Ronald Semerdjian testified as the medical expert. In 2015, the ALJ issued a second ruling reaching the same result as the first ruling. Plaintiff again appealed. In 2017, after full briefing, this Court issued a written ruling finding that a remand was required based on multiple arguments. *See Ritacco v. Berryhill*, 2017 WL 2215016 (N.D. Ill. May 19, 2017); R. 1518-1531. The Court stated that it was unfortunate that the ALJ had issued two erroneous decisions in two years and recommended that a different ALJ be assigned to the case. R. 1531. On remand, a new ALJ took over. After holding a hearing, at which Dr. Semerdjian again testified, the new ALJ issued an unfavorable ruling. This appeal is from that ruling, the third such ruling in this now long-running case.

Plaintiff raises arguments here similar to those he raised in the last appeal. In reading plaintiff's briefs, the Court discerns two primary arguments being made.[2] The first is what the Court will refer to in shorthand as the extrapolation argument. The second is that the credibility analysis was flawed.

**I.      The Extrapolation Argument**

The Court will first briefly summarize this argument, which goes by various names, and then discuss how plaintiff tries to use it. In a nutshell, the extrapolation argument (again, this is the Court's label) is a method of proof for establishing that a claimant was disabled in an earlier

---

[2] Plaintiff's opening brief only contains one argument heading, the bland assertion that the ALJ failed to build a logical bridge between the evidence and conclusion.

period of time when contemporaneous medical evidence was lacking or insufficient. The method relies on the fact that certain slowly progressing diseases follow a typical or well-known progression. Relying on this general knowledge, a doctor can then combine it with known facts about a claimant's condition at a later point in time and then extrapolate backwards to make an educated guess about the claimant's condition at an earlier point. The theory rests on the assumption that progressive diseases don't suddenly emerge. The argument usually requires at least two chronological data points to draw a comparison line, somewhat as it would be done on two-axis graph. This argument is authorized by, and discussed more fully in, SSR 83-20 and Seventh Circuit cases such as *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006).[3] It has sometimes been described as a "retrospective diagnosis." *Id.* at 822.

Plaintiff's attempt to rely on this theory begins with the foundational fact that, in early 2014, plaintiff consulted with Dr. Stuart Rich at the University of Chicago who stated that plaintiff's silicosis was then "severe" and that plaintiff "likely should be considered for lung transplantation." R. 1320-21. Everyone seems to agree that plaintiff would qualify as disabled if this were the relevant date. But this date was over three years after the DLI. The question is whether plaintiff can rely on Dr. Rich's 2014 statements, or alternatively on other post-DLI evidence, to shed light on his condition during the DLI period.

To be clear, plaintiff is not relying solely on the extrapolation argument. There are at least two other sources of information. Some contemporaneous medical evidence exists from the DLI period, although it is not extensive. Specifically, plaintiff was then being treated by Dr. Sean Forsythe, a pulmonologist. Plaintiff saw this physician several times during the DLI period, and he went to emergency rooms twice in May 2010. The second source is plaintiff's testimony from

---

[3] On October 2, 2018, SSR 83-20 was rescinded and replaced by SSR 18-1p and 18-2p.

the three hearings. At these hearings, he was recollecting what his symptoms were many years earlier. He testified that he had chest pains, shortness of breath, weakness in his legs, and fatigue causing him to take catnaps.

In plaintiff's last appeal, he argued that the prior ALJ had flatly and improperly declared that all post-DLI evidence was "immaterial to the issue at hand." R. 1524. That is, the ALJ misunderstood the law. This Court agreed, and discussed SSR 83-20 and Seventh Circuit cases like *Allord*. *See* R. 1524-25.

On remand, plaintiff's counsel again pursued this argument. Plaintiff argues here that the new ALJ was hostile to this theory—if not downright confused by it. Plaintiff claims that the ALJ did not "take this evidence seriously"; did not allow counsel to fully cross-examine Dr. Semerdjian by cutting off lines of questioning and re-directing the doctor's testimony; and failed to follow SSR 83-20 by "consistently refus[ing] to acknowledge" the relevancy of post-DLI evidence. Dkt. #12 at 7-8. In short, the ALJ prejudged this argument "early on." *Id.* at 6.

Rather than beginning with this question of whether the ALJ impeded counsel's efforts, the Court will first try to understand plaintiff's extrapolation argument and then evaluate its viability. In other words, the Court will temporarily take the ALJ out of the picture.

Counsel first described this theory in the pre-hearing letter brief. Here is the key paragraph:

> **Theory of the Case**
>
> Claimant should be found to meet or equal Listing 3.02 based upon his moderate to severe silicosis which has existed since 2003. SSR 83-20 explicitly notes that in the case of slowly progressive impairments that "it will be necessary to infer the onset date from the medical and other evidence that describe the history of symptomatology of the disease process." Therefore, while the only FEV1 score prior to his DLI is above listing level, it was also specifically indicated that this spirometry testing was an improvement since her [sic] prior test in 2005. (16F at 3). Post-DLI there are numerous fluctuations of his FEV1 scores, many falling

4

> below listed level, while others, as recently as May of 2016, reaching nearly the same level as the December 2009 test. These fluctuations occurred despite the fact that, at least in 2011 and 2012, the CT scan findings were essentially the same as the 2010 CT scan. (10F at 80; 5F at 25). Given the fluctuations of this FEV1 scores and the fact that his spirometry testing coincided with an encounter where he was not experiencing much wheezing or coughing (as opposed to other visits during the period in question like his May 2010 ER visits), it should be reasonable to find that Claimant met listing levels prior to his DLI. At the very least it should be clear [that] he would have extensive limitations stemming from this impairment that would result in an absentee rate outside the accepted tolerance of even sedentary work.

R. 1709.[4]

The paragraph contains a lot of information, some of it technical. Starting with the big picture, the Court notes that counsel seems to be referring to two alternative ways of using the extrapolation argument. The first and primary theory, which takes up all but the last sentence of the paragraph, is that plaintiff meets or equals Listing 3.02. The second theory, presented as a type of fallback argument, is that plaintiff could be found disabled based on an unacceptable "absentee rate" caused by his silicosis symptoms. These two arguments correspond to the two basic methods of proof—meeting a listing at Step Three or relying on a functional capacity analysis ("RFC") at Step Four. Meeting a listing is generally regarded as the tougher but more direct route. One court referred to the listings as "a catalogue of 'automatic disabilities.'" *Mersel v. Heckler*, 577 F. Supp. 1400, 1406 n.15 (S.D.N.Y. 1984), *as quoted in* Carolyn A. Kubitschek and Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court*, p. 310 (2019 ed.) (hereinafter, "Kubitschek and Dubin"). The listings are "automatic" in the sense that they rely on technical medical criteria, and do not require analysis of functional limitations, vocational factors, or credibility. *Id.*

---

[4] The ALJ quoted a large portion of this paragraph in the written decision. R. 1436.

Plaintiff's counsel chose to rely on Listing 3.02. It is entitled "Chronic respiratory disorders" and is not specifically geared towards silicosis. This listing is met if the claimant meets certain numerical thresholds from one of several spirometry tests. Counsel relied on the forced expiratory maneuver ("FEV1"). To meet the listing, the FEV1 score must be *below* the threshold. However, as counsel recognized, plaintiff faced a large stumbling block. Plaintiff's only FEV1 score during the DLI period (one taken in December 2009) was well above the threshold. To get around this problem, counsel attempted to rely on the extrapolation argument and draw inferences from other FEV1 scores. But this is where the argument runs into confusion. As counsel recognized, plaintiff had fluctuating FEV1 scores over a broad period, with some scores falling below the threshold and some not. For example, plaintiff's score in May 2016 was the same as the score in December 2009. However, counsel argued that plaintiff's CT scans did not fluctuate but instead showed a more predictable downward progression.

This theory requires too many unnatural twists and turns to get around obvious pitfalls. Unlike the paradigmatic extrapolation case, where there is *no* medical evidence during the relevant period, here there is an FEV1 test during the DLI period. So one preliminary question is why that score shouldn't be the end of the story. Plaintiff must argue that this score was wrong, perhaps an outlier. Plaintiff makes a brief attempt at such an argument by stating that this score was taken during a time when plaintiff "was not experiencing much wheezing or coughing." But even if this argument were a valid reason to ignore this one score, plaintiff would still have to contend with the fact that all the other many FEV1 scores fluctuated above and below the threshold for a decade or more. Notably, the most recent score available, taken in January 2018, still did not meet the threshold. R. 1709. Plaintiff has not tried to argue that a composite or average of these many scores was below the threshold. Counsel's response is to argue that the

CT scans were a better indicator. This may be true, but it does not help the listing argument because 3.02 uses the FEV1 score (or other similar spirometry tests) as the sole criterion.

For these reasons, the Court does not find that plaintiff has presented a viable way to meet the listing based on an extrapolation theory. Dr. Semerdjian testified that plaintiff could not meet or equal this listing.[5] Moreover, he testified that silicosis did not have a clear progression and that each case was different. This testimony further undermines plaintiff's attempt to use an extrapolation argument. However, Dr. Semerdjian did agree with plaintiff's counsel that silicosis sometimes causes fatigue, one of plaintiff's alleged symptoms. But Dr. Semerdjian further pointed out that the critical question of how severe or frequent this problem was at that time was a question that turns on plaintiff's credibility.

As for the possibility that plaintiff could rely more generally on an extrapolation theory to support an RFC argument, the Court again finds that plaintiff has not articulated a clear theory. An overarching problem is that plaintiff's symptoms, like the FEV1 scores, seem to have oscillated at various points, rather than exhibiting a steadily downward progression. Various external factors could have played a role, including plaintiff's stopping smoking in 2008 and his going back to work in the construction industry in 2009, which his doctors advised him not to do. In short, although his condition may have generally declined over the entire 15-year timespan from 2003 to 2018, this does not necessarily shed light on how bad the condition was in 2009-10 or prove that it was declining in a continuous orderly manner. For example, at the December 2009 visit, Dr. Forsythe noted that plaintiff's spirometry tests had improved since 2005.

Another weakness in counsel's extrapolation theory is that he ignores large chunks of the evidentiary record. Counsel's theory rests primarily, if not exclusively, on the one fact that, in

---

[5] Other than a few vague references, plaintiff does not pursue the argument that he equaled this particular listing.

early 2014, Dr. Rich suggested that plaintiff begin thinking about getting his name on the transplant list.[6] But this is a wobbly fact upon which to build an extrapolation argument. Not only is it far removed in time, over three years after the DLI, but it is also a mushy metric, not easy to cross-compare with a comparable earlier observation in the DLI period.

Plaintiff's extrapolation theory does not rely on the medical evidence closer in time to the DLI. Plaintiff saw several doctors from 2011 to 2013, but plaintiff's brief curiously skips over this evidence and jumps to Dr. Rich's 2014 observation. This raises a question as to whether this evidence cuts against plaintiff's theory. In reviewing this evidence, the Court notes that it appears to present a mixed picture. To cite one example, plaintiff's pulmonologist at the time was Dr. Kellar. He twice completed RFC questionnaires, first in September 2012 and then again in June 2013.[7] These opinions provide two possible data points, roughly nine months apart. In general, Dr. Kellar's 2013 opinions portrayed plaintiff's condition as having worsened since the 2012 opinions. However, his 2012 opinions contain several assessments that are in the ballpark with the ALJ's RFC findings. For example, Dr. Kellar opined that plaintiff's prognosis was "good," that he could sit at least 6 hours a day and stand at least 4 hours a day, and that he would miss about one day per month. R. 620-621, 625. The latter finding is consistent with the testimony of the vocational expert, and is contrary to plaintiff's argument that he would have been absent too often from work in 2010.[8]

Having concluded that plaintiff's extrapolation theory is not viable, the Court must address the possibility that it was the ALJ's fault why this is so. The Court agrees that the ALJ

---

[6] As of the 2018 hearing, plaintiff was still "in the process" of getting his name on the list. R. 1476.
[7] Each time, he completed two similar forms so that there are four total opinions. *See* Exs. 11F, 12F, 13F, 14F.
[8] It should be noted that Dr. Kellar's findings are not entirely consistent from form to form, and that he made other observations supporting plaintiff's claim. But by all indications from these forms, his opinions were about plaintiff's *current* condition, in 2012 and 2013 respectively; he thus gave no opinion about—and apparently was not asked to give an opinion about—plaintiff's earlier condition in 2010.

8

made statements that reflected impatience with this line of questioning and maybe reflected a skepticism towards the extrapolation argument. For example, at the start of the hearing, the ALJ stated the following: "you have submitted quite a bit of records that are long past the date insured, which is really irrelevant and unnecessary." R. 1450. This statement comes close to being inaccurate, but the phrase that arguably rescues it is "long past." Although it would have been improper for the ALJ to have made a blanket conclusion that *all* post-DLI evidence was by definition irrelevant, the ALJ reasonably could have concluded that the evidence from many years past the DLI was losing its probative value.

However, the Court need not further parse these statements because the Court finds that any errors were harmless. First, even if the ALJ made statements indicating that she would not consider post-DLI evidence, the fact remains that she did discuss at least some of this evidence in the subsequent decision. *See* R. 1432. Second, after reading the transcript, the Court finds that plaintiff's counsel in fact was allowed to ask Dr. Semerdjian questions about the extrapolation theory and that he provided his opinions on various aspects of it. Notably, he stated that silicosis does not have a typical progression, a fact that takes much of the air out of plaintiff's theory. Third, counsel could have avoided the uncertainty of trying to elicit favorable testimony from Dr. Semerdjian by getting an independent medical opinion.[9] In sum, the Court does not find that the ALJ erred by not adopting plaintiff's extrapolation theory to show that plaintiff met Listing 3.02. Accordingly, plaintiff's only way to recover is under an RFC analysis.

---

[9] *See* Kubitschek and Dubin, p. 146 ("Claimant's may also wish to utilize non-examining physicians. In a situation in which the claimant is seeking disability benefits for a prior period of time, or whose disability began several years ago, and whose prior treating physician is unavailable, the claimant's attorney may ask another physician to examine the claimant's medical records and give an expert opinion as to the extent of the claimant's impairment as demonstrated by those records.").

**II.     The Credibility Argument**

This leads to plaintiff's second argument that the credibility finding was flawed. In this Court's 2017 decision, we criticized the prior ALJ's credibility analysis because it relied too much on extraneous minor discrepancies. R. 1530. The ALJ's current credibility analysis is somewhat different, but still deficient.

The credibility analysis is contained in the following two paragraphs, with the first paragraph ostensibly functioning as a fact section and the second as the formal analysis:

> The claimant testified in part that he saw a pulmonologist in December 2009 at Loyola but does not recall why he saw the doctor only once during the relevant period. He used a preventative inhaler twice a day, rescue inhaler two or three times a day and nebulizer one to three times a day. Humidity and cold worsened his problem. He saw a new pulmonologist after May 20[11], referring to Dr. Keller, because he was closer. As a result of the motor vehicle accident, he had neck pain after June 2011 (which he admitted was not bad anymore). He now is in the process of getting on the lung transplant list because he is worse now. He then admitted it really started progressing in 2015-16. He used a CPAP only briefly because he could not tolerate the mask.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical and other evidence of record. The Court's finding that the prior ALJ analysis of the claimant's credibility was flawed is correct. However, one item cited, that the claimant testified he was let go because of non-medical reasons (13A/13), does relate to the issue of severity insofar as it suggests his impairment was not as severe as he alleged at the time and that he remained capable of performing SGA at the time. This clearly goes to weight, albeit not a conclusive point by itself.

R. 1433.

Plaintiff argues that this analysis is terse, that it fails to apply the seven factors in SSR 16-3p, and that the one explicit rationale relied on was factually questionable.[10] This Court agrees

---

[10] The SSR 16-3p factors are the following: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other

that the analysis was not sufficient even considering the Seventh Circuit's fairly lenient standard. *See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) ("we give the ALJ's credibility finding 'special deference' and will overturn only if it is 'patently wrong'").

The first paragraph is merely a recitation of various facts. It contains no explicit rationales, nor any formal analysis explaining why the facts were chosen or why they show plaintiff lacked credibility. However, one could make the argument, which the Government basically does, that these facts contain implicit hidden rationales. The Court will address this possibility below, but it is worth noting here that this approach makes this Court's review more difficult. If the ALJ does not explicitly identify the rationales being relied on, this Court has to make an educated guess about what the ALJ specifically believed.

The second paragraph starts with the dreaded and oft criticized "boilerplate." *See Roddy v. Astrue*, 705 F.3d 631, 635 (7th Cir. 2013). But this paragraph does contain an explicit rationale, albeit only one. This is the assertion that plaintiff was let go from his construction job in 2009 for non-medical reasons, thus suggesting he was still able to work then. The only evidence the ALJ relied on was plaintiff's testimony. Plaintiff argues that the ALJ twisted his words to change a fact that supported his case to one that strongly detracted from it. This Court agrees. The relevant testimony is the following, with the ALJ asking the questions:

> Q Now in 2009 you were working for Walsh Construction doing construction labor work, right?
>
> A Yes. []
>
> Q So why did you stop doing that job?
>
> A I think it was they let me go for lack of performance.

---

symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

  Q What were they saying you were not up to performance on?

  A They don't—they didn't tell me nothing. They just said they had nothing for me.

  Q Oh, because of lack of work or was it—

  A Right, because I was slower than probably other people.

  Q Okay. So they weren't saying your performance was bad then?

  A Well, that's what I'm thinking if they only kept me a month.

  Q Okay. They didn't say—

  A In my whole career I never got let go for any reason like that just out of the blue.

  Q Were other people let go at the same time?

  A Not that I'm aware of. I'm sure they weren't. They had a lot of work.

R. 1457-58.

It is hard to see how the ALJ could fairly extract an admission that plaintiff was let go for non-medical reasons from this vague testimony. Plaintiff is not a lawyer, but he seems to have been making a pretext-based argument, suggesting that his employer was not upfront about the true reason he was being let go. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (pretext is a lie). Other than this testimony, no other evidence is available. In short, the Court does not find that the ALJ had a valid evidentiary basis for effectively doubting plaintiff's explanation and reading into it a fact he never testified to directly. The Government does not discuss this testimony or make a valid counter-argument. In fact, the Government implicitly concedes the ALJ's rationale was weak, stating that it could be dismissed as having "limited usefulness" to either side. Dkt. #18 at 11. But given that this was the only explicit rationale and

given that it has collapsed under scrutiny, the ALJ's credibility analysis is left looking like a unicyclist with a flat tire.

But maybe not if some implicit rationales can be extracted from the first paragraph or from other parts of the decision. The Government makes a tepid attempt at doing so, but its argument mostly consists of simply restating the facts from the first paragraph. *See* Dkt. #18 at 9-10. Like the ALJ, the Government does not attempt to connect the various facts into a fully-formed argument, although the Government may be concerned that doing so would violate the *Chenery* doctrine.

Turning back to the first paragraph, the Court notes that the facts hint at various credibility rationales. For example, the ALJ may have concluded that plaintiff's treatment was too limited during the DLI period to support his allegations. This rationale is suggested by the ALJ's statement that plaintiff only saw his pulmonologist "only once" during the DLI period. Relatedly, the ALJ mentioned that plaintiff was using inhalers during this time, a fact that may be a suggestion that plaintiff's treatment was conservative.

However, if the ALJ intends to rely on these rationales on remand, she needs to do more legwork to support them. In particular, the ALJ should provide a more complete summary of plaintiff's treatment. The ALJ's claim that plaintiff only visited Dr. Forsythe once during the 16-month DLI period is technically incorrect. Plaintiff saw him two times, in August and December of 2009. By itself, this is not a glaring error. But a related and broader problem is that the ALJ did not acknowledge that plaintiff had been seeing Dr. Forsythe on a fairly regular basis going back as far as 2006. Based this Court's informal count, plaintiff saw him at least 13 times over a three-year period from 2006 to 2009. *See* R. 705, 700, 696, 692, 687, 683, 671, 667, 663, 658, 654, 650-51, 646. The ALJ's discussion leaves out this back history, arguably creating the mis-

13

impression that plaintiff's treatment was more sporadic than it actually was. Although it is true that most of these visits occurred before the DLI period, they still suggest that plaintiff had been fairly diligent in seeking treatment and, importantly, may have "reached a plateau" in utilizing available treatments. SSR 16-3p. The ALJ has not established that more visits or different treatments would have changed anything. *See* SSR 16-3p ("A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual.").[11]

Another rationale suggested by the first paragraph is the ALJ's brief reference to plaintiff's testimony that his condition "really started" worsening in 2015-16, well after the DLI. The Government highlights this fact. This Court agrees that this fact potentially hurts plaintiff's theory that the worsening had occurred before the DLI. Plaintiff responds by arguing that even if some worsening occurred in 2015-16, his condition still may have already worsened sufficiently by 2010. On remand, the ALJ may rely on this fact as part of a broader credibility analysis, but the ALJ should allow plaintiff to develop this counter-argument.

Another issue needing more attention on remand is the objective evidence. This topic is an important one, although often a difficult one to assess in that, as the parties recognize, the objective evidence cannot be relied on as the "sole" reason for finding a claimant not credible but at the same time is considered to be a "useful indicator" of the claimant's credibility. *See* SSR 16-3p. In their briefs, the parties circle around this issue, with each side picking out facts in their favor. The ALJ's decision refers to this evidence in a limited way, but a more systematic and thorough analysis is needed.

---

[11] This Court noted this same point in the 2017 decision. *See* R. 1527-28 ("The larger point—one not contested by the Government—is that there is no cure or specific treatment for silicosis. Plaintiff was receiving the standard treatments consisting of inhalers, steroids, cough medicine, and nebulizer treatments.").

Plaintiff argues that he reported his various symptoms at medical visits during the DLI period and that objective tests (*e.g.* x-rays, CT-scans, and spirometry tests) from that period also bolstered his allegations. But plaintiff makes this argument in a general way. It would be helpful if the issues were analyzed in more detail, with attention paid to each specific symptom and how frequent they each were. Dr. Semerdjian discussed some of this specific evidence, but the ALJ did not specifically rely on it.

The Court will note a few examples of the types of questions that arose during this Court's review of the record. Fatigue was one alleged symptom. Plaintiff testified that he could not work full-time because he needed to take catnaps during the day. But did he mention this problem to his doctors? Dr. Semerdjian testified that there was no objective evidence supporting the fatigue allegation, although he agreed that in general silicosis can cause fatigue. R. 1483. Another symptom was chest pains. But it is unclear how frequent they were and whether they would prevent plaintiff from working. Specifically, plaintiff testified that he got them while sleeping and that they occurred "weekly back then." R. 1465. It is not clear whether this would preclude him from working. As for shortness of breath, plaintiff testified that it occurred both while he was moving and sitting still. R. 1469. But Dr. Forsyth's notes, however, seem to contradict this claim. In particular, in his notes from the December 30, 2009 visit, Dr. Forsythe wrote:

> Since last visit, feels like he is having more dyspnea on exertion.
> *No symptoms at rest* and none at night.
> Not much wheezing or cough.

R. 646 (emphasis added). The Court is not claiming here to have thoroughly or completely analyzed this evidence, but mentions these points by way of example of the type of deeper analysis that would provide a stronger foundation for the credibility finding.

To sum up, the Court finds that, despite the ALJ's distrust toward the extrapolation theory, that plaintiff has not articulated a clear or viable argument that this theory helps his case. In this respect, this case has been narrowed somewhat. However, the Court finds that the ALJ's credibility analysis was unfortunately again deficient, necessitating yet another remand. On remand, the ALJ should thoroughly analyze this issue, taking note of the comments in this opinion and also specifically applying the 16-3p factors. Plaintiff argues in the last paragraph of his reply brief that the Agency has repeatedly failed to analyze these issues properly and that this Court, therefore, should remand for an award of benefits outright. Although the Court shares plaintiff's frustration with the length of this case, the Court does not find that the record is so clear or one-sided that the Court could order such a remedy, and plaintiff has provided no authority for this Court doing so. As noted above, plaintiff's case faces various hurdles. So, despite the undesirability of yet another remand, this Court must order one because this Court unfortunately has no power, given the current mixed record, to simply declare that enough is enough and end this case by fiat.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted; the government's motion is denied; and this case is remanded for further consideration.

Date: August 26, 2019         By: _____
                                  Iain D. Johnston
                                  United States Magistrate Judge